UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEELAND F. GRAY, JR., *et al.*,<br>    Plaintiffs,<br><br>    v.<br><br>TOWN OF EASTON, *et al.*,<br>    Defendants. | No. 3:12-cv-00166 (JAM) |

**RULING GRANTING SUMMARY JUDGMENT**

This is an equestrian equal protection case. Plaintiffs have a horse riding and boarding business in the Town of Easton, Connecticut. To their credit, plaintiffs voluntarily complied with Easton's special zoning requirements for horse business operations. In this lawsuit, however, plaintiffs allege that the town and its zoning officials have violated the Constitution's Equal Protection Clause, because they have failed to investigate and enforce the same zoning requirements against other horse businesses in Easton.

Defendants have moved for summary judgment. I conclude that no genuine issue of fact remains to show that defendants acted irrationally or invidiously in violation of the Equal Protection Clause.  In addition, I conclude that each of the individual defendants is entitled to qualified immunity. Accordingly, I will grant defendants' motion for summary judgment.

**BACKGROUND**

Plaintiffs are Leeland and Kirsten Gray as well as three companies they own and that are all based from the Grays' home in Easton, Connecticut. Doc. #106 at 2. Plaintiffs have named as defendants the Town of Easton, the Town of Easton Planning and Zoning Commission, the Town's zoning enforcement officer, and numerous past and present members of the Town's Planning and Zoning Commission. Doc. #1 ¶¶ 5–22.

1

In 2006, plaintiffs became interested in offering horse riding lessons and horse boarding services on their property. *Id.* ¶ 30; Doc. #106 at 4, 43. At the suggestion of the town's zoning enforcement officer, they went to the Planning and Zoning Commission and were told that they would need to comply with certain town regulations in order to engage in these activities. *Id.* at 4, 44.[1] First, they would have to own at least 10 acres of land. Second, they would have to apply for and obtain a special permit to conduct commercial horse business activities. Doc. #1 ¶¶ 25–28, 32; Doc. #106 at 3, 44. Plaintiffs do not dispute the wisdom or necessity of these zoning law requirements.

Plaintiffs told the Commission that they anticipated acquiring additional adjacent acreage that they were already leasing, and the Commission requested that they report back with a status update of the anticipated land acquisition during the summer of 2007. Doc. #1 ¶ 33; Doc. #106 at 4–5, 45. In July 2007, plaintiffs bought the adjacent property so that they now had more than 10 acres of land. Doc. #1 ¶ 34; Doc. #106 at 5, 45. The following month, plaintiffs updated the Commission on their purchase of the land, and they were advised that they should now apply for a special permit. Doc. #1 ¶ 35; Doc. #106 at 6, 45.

In November 2007, during a chance meeting while plaintiff Leeland Gray was at town hall, the zoning enforcement officer told him that he should apply for a special permit. Doc. #1 ¶ 36; Doc. #106 at 7, 45–46. Although plaintiffs were already conducting horse business operations on their property, they were not formally ordered to apply for a special permit; nor were they ordered to cease and desist their ongoing horse business operations pending their

---

[1] Plaintiff Leeland Gray testified in his deposition that plaintiffs had been running a horse business on the property and that "we approached the Commission to find out if what we were doing was okay in October 2006" and that this occurred "after a conversation with the zoning enforcement officer who suggested that we meet with the Commission to make sure what we're doing is okay." Doc. #86, Ex. 1 at 34. According to Gray, the zoning enforcement officer "either came to our property or I might have seen him at the town hall" and that "I was often at the town hall for building permits . . . so if I didn't see him at our property it would have been at the town hall." *Id.* at 35.

application for and approval of a special permit. *Id.* at 7–8, 46; Doc. #86, Ex. 1 (Leeland Gray Dep. at 42).

In January 2008, plaintiffs submitted a special permit application, and two months later the Commission advised plaintiffs that the special permit had been approved subject to certain conditions including construction of buildings and other site work. Doc. #1 ¶¶ 41–42; Doc. #106 at 9–10. Plaintiffs spent more than $25,000 to comply with the special permit requirements, and the required conditions were completed by June 2010 at which time plaintiffs filed their special permit on the Town of Easton land records. Doc. #1 ¶¶ 43–44; Doc. #106 at 9–10. In the meantime, plaintiffs were not prohibited from continuing to use their property for horse business operations. *Id.* at 11.

Plaintiffs complain that they were required to comply with the town's land-size and special-permit requirements despite their complaints to town officials that several other equestrian businesses were not required to comply. Doc. #1 ¶ 45; Doc. #106 at 11–12. With respect to several other horse riding/boarding businesses in Easton, plaintiffs complain that defendants "knowingly chose to ignore their duties and obligations as public officials, and specifically, their duties and obligations to enforce municipal zoning regulations in a fair, equal, consistent, and impartial manner." Doc. #1 ¶48. Plaintiffs further contend that defendants "deliberately and intentionally failed to investigate and/or failed to take any enforcement action and/or failed to take enforcement action on a timely basis in response to numerous complaints from the Plaintiffs and others." *Id.* ¶ 51(a); *see also id.* ¶¶ 55, 60, 63, 67, 74, 79, 83. Defendants have now moved for summary judgment.

**DISCUSSION**

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Plaintiffs allege parallel theories of liability for class-of-one discrimination and selective enforcement. Both rely on the Equal Protection Clause of the Fourteenth Amendment, which "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).[2]

---

[2] Both theories are themselves sub-types of just one way of alleging an equal protection claim. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014) (noting more generally that there are "three types of equal protection violations," including "(1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect . . . ; and (3) a facially neutral law that is enforced in a discriminatory manner"), *cert. denied*, 135 S. Ct. 1853 (2015).

### *Class-of-One Equal Protection Claim*

A class-of-one equal protection claim arises when a plaintiff is "intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*)). A class-of-one plaintiff must identify at least one comparator with whom the plaintiff shares "an extremely high degree of similarity" sufficient to "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (internal quotation marks omitted). More specifically, a plaintiff must establish not only that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," but also that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Fortress Bible Church*, 694 F.3d at 222 (internal quotation marks omitted).

These requirements are in keeping with the highly deferential nature of rational-basis review under the Equal Protection Clause, which "does not demand . . . that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn*, 505 U.S. 1, 16 (1992). Instead, a court need only ascertain "that a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker." *Ibid.*; *see also Sensational Smiles, LLC v. Mullen*, __ F.3d __, 2015 WL 4385295, at *2–3 (2d Cir. 2015) (summarizing deferential principles of rational-basis review under the Equal Protection Clause).

There are some reasons to be skeptical of equal protection claims against local government officials. Whether it be about zoning permits, building inspections, parking regulation, garbage pick-ups, leash law enforcement, or license issuances, the reality is that local town officials engage in a vast range of highly discretionary decisions that affect the property rights and everyday activities of town citizens. It is a truism that local governments have limited taxpayer funds, often because of the budget-conscious concerns of the very local taxpayers who may later complain about resulting shortfalls or inequities in the provision of town services. Small town governments often make decisions with less than perfect information and ordinarily without the benefit of sophisticated enforcement resources. Often enough, local government decisions are made by citizens who donate their time free of charge to serve their town.[3]

The point is that not every wrong or ill-informed decision by a local government official is grounds for a federal constitutional cause of action. Nor is a nefarious purpose to be presumed from a town's incomplete enforcement of the law, because "equal protection does not require that all evils of the same genus be eradicated or none at all," and "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980) (citing *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109–10 (1949)). For these reasons, federal courts are understandably reluctant to apply the Equal Protection Clause in a manner that may tend to constitutionalize large swathes of local government decision-making and to transform federal courts into super boards of review for the day-to-day decisions of municipal governments. *See, e.g.*, *Cordi-Allen v. Conlon*, 494 F.3d 245, 251–52 (1st Cir. 2007); *Crippen v. Town of Hempstead,* 2013 WL 1283402, at *7 (citing cases).

---

[3] Plaintiffs admit that Easton "has limited resources from both a personnel and financial standpoint" but deny that these limitations are "material" in view of defendants' alleged knowledge of other violations of zoning regulations. Doc. #106 at 27–28. It is undisputed that Easton's zoning enforcement officer is employed only half-time and that each of the members of the Planning and Zoning Commission are volunteers who ordinarily meet twice per month. *Id.* at 27.

In light of these concerns and the governing legal standards, it is clear that plaintiffs here were not irrationally singled out and were not similarly situated for equal protection purposes to any of their alleged comparator horse businesses in Easton. Plaintiffs sought guidance and came forward to ask what they needed to do to operate their horse business in conformity with the town's zoning law. They were asked to comply with the law as written. They then proceeded to comply with that law—first by means of purchase of the minimum acreage requirement, then by means of application for a special permit and institution of site improvements as required for the permit.

None of plaintiffs' alleged comparators are contextually similarly situated. To be sure, they run horse businesses like plaintiffs. But the record does not show that any of these comparators approached the town in the first instance as plaintiffs did to ask what they needed to do to comply with the law. Instead, plaintiffs fault the defendants for failing to track down and pursue the non-compliant comparators—they complain that defendants "deliberately and intentionally *failed to investigate* and/or *failed to take any enforcement action* and/or failed to take enforcement action on a timely basis in response to numerous complaints from the Plaintiffs and others." Doc. #1 ¶51(a) (emphasis added). At bottom, plaintiffs fault Easton for allowing them to voluntarily comply with the law at the same time that Easton had failed to corral every other horse business in town to ensure their equal compliance with zoning laws.

The Equal Protection Clause does not require local governments to enforce the law against everyone or against no one at all. Suppose, for example, that a town resident pays $10 for a picnic permit at town hall, but then he arrives at the town park only to discover numerous scofflaw picnickers who have no picnic permit. Has the law-abiding picnicker suffered a violation of the Equal Protection Clause? No, he has not. For any number of resource reasons, it

is neither wholly irrational nor presumptively discriminatory for the government to apply and enforce the law against the ready-and-willing while failing to do so against the irresponsible or recalcitrant. *See EDCO Envtl. Servs. Inc. v. City of Crown Point, Ind.*, 2014 WL 4680746, at *4 (N.D. Ind. 2014) (rejecting class-of-one claim against city for failing to enforce zoning law against plaintiff's competitor, noting that "[t]he City's failure to prosecute the [competitor] for zoning violations no more singles out Plaintiff for discriminatory treatment than a law abiding motorist could be considered to be targeted for discriminatory treatment because the police did not issue a ticket to a speeder").

For that matter, plaintiff's theory would have equally troubling implications for criminal law enforcement. If a bank robber turns himself in at the police station, could he complain that he may not be prosecuted unless and until the police deploy to arrest any other bank robbers at large? Of course, he could not. That is because "[t]he Constitution does not require states to enforce their laws (or cities their ordinances) with Prussian thoroughness as the price of being allowed to enforce them at all." *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985) (Posner, J.). It follows that "random underenforcement of the law by government authorities does not violate equal protection and is therefore not a proper context for a class of one claim." Robert C. Farrell, *The Equal Protection Class of One Claim: Olech, Engquist, and the Supreme Court's Misadventure*, 61 S. Car. L. Rev. 107, 114 (2009).

Plaintiffs insist that "[t]o establish that another property owner is 'similarly-situated,' [they] need only show that the use of the property was the same; that is that other property owners actually were engaged in the same regulated use." Doc. #105 at 18. But that is wrong. Enforcement context, sequence, and timing also matter. As the First Circuit has recognized, "[i]n the land-use context, timing is critical and, thus, can supply an important basis for differential

treatment." *Cordi-Allen,* 494 F.3d at 253; *see also Brisbane v. Milano*, 443 Fed. Appx. 593, 595 (2d Cir. 2011) (plaintiff arrested by police in response to victim's complaint not similarly situated to alleged comparator lawbreaker about whom victim had not complained).

In short, no genuine issue of fact remains to support plaintiff's class-of-one equal protection claim. No reasonable jury could conclude that the differential treatment at issue here was the product of irrationality or that any of plaintiff's alleged comparators were contextually similarly situated for purposes of application and enforcement of the law under the Equal Protection Clause.

### *Selective Enforcement Equal Protection Claim*

Closely related to a class-of-one claim, a claim of selective enforcement or selective prosecution arises when the government seeks to apply the law to a plaintiff differently than it would to other similarly situated individuals for constitutionally impermissible reasons such as on grounds of a plaintiff's race or malicious intent. To prevail on such a claim, a plaintiff must prove that:

> (1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Brown v. City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir. 2012) (alteration in original) (internal citation and quotation marks omitted).

Unlike in the class-of-one context, the Second Circuit has yet to specify the degree of similarity between comparators that must exist to prove a selective-enforcement claim.[4] But because the two theories themselves are so similar, there is little reason to suppose why a selective-enforcement claim should not require the same high degree of similarity between

---

[4] There is apparently a dispute on this issue among district courts of this Circuit. *See Viteritti v. Inc. Vill. of Bayville*, 918 F. Supp. 2d 126, 135 (E.D.N.Y. 2013) (collecting cases).

9

comparators as the Second Circuit requires for a class-of-one claim. Accordingly, for the same reasons as noted above for plaintiffs' class-of-one claim, no genuine fact issue remains as to any similarly situated comparators for purposes of their selective enforcement claim.

Even assuming plaintiffs could show that their comparators are similarly situated, no genuine fact issue remains as to their claim that there was any constitutionally improper reason that motivated defendants' conduct. Plaintiffs do not allege that they are members of a protected class or that they have been penalized for their exercise of any fundamental right. Nor could any reasonable jury conclude that ill-will or malice motivated defendants to discriminate against plaintiffs. For example, malice against plaintiffs could not plausibly or reasonably be inferred from the fact that the Commission's chairman allows his land to be used for trail rides by one of the alleged non-conforming horse businesses or from the fact that the vice-chairman of the Commission has a grandchild who has taken riding lessons at another one of the alleged non-conforming businesses. Doc. #105 at 27.[5] *See Harlen Assocs.*, 273 F.3d at 502–03 (evidence of malice against zoning plaintiffs was "wholly speculative" where plaintiffs did not allege "that they had any personal conflicts with members of the Board or with Village officials" and despite contention that mayor lived on same block as the property at issue but failed to recuse himself from decisionmaking); *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) ("evidence of impermissible motive was very weak, consisting entirely of evidence that one town official, who was not a member of the zoning board that denied the variance, was annoyed by Party City's owners"); *see also Bizzarro v. Miranda*, 394 F.3d 82, 86–87 (2d Cir.

---

[5] I have also considered other specific examples of alleged malice described in plaintiffs' briefing. *See* Doc. #105 at 28–30. Plaintiffs strive to make much of a stray and confusing remark about "a hanging, a lynching" by the Vice-Chairman at a meeting in May 2010, but the reference is devoid of meaningful context and does not support a reasonable inference of malice. Plaintiffs' other examples are equally unpersuasive.

2005) (same; collecting similar cases). In short, no genuine issue of fact remains to suggest that any of the defendants violated the Equal Protection Clause.

Moreover, because the Equal Protection Clause does not require perfectly uniform enforcement efforts, there is no merit to plaintiff's reliance on a remark by one of the Commission members during a Commission meeting that "we're potentially guilty of selective enforcement in a lot of what we do" and that "given what the town has allowed us to do, it's harder to be more, you know, to do more enforcement but we are guilty of it, you know." Doc. #105 at 4. A selective enforcement claim requires more than selectivity in enforcement; it requires selective enforcement based on impermissibly discriminatory or malicious reasons that plaintiffs have failed to establish here. *See Harlen Assocs.*, 273 F.3d at 499-500.

In short, no genuine issue of fact remains to support plaintiff's selective enforcement claim. No reasonable jury could conclude that the differential treatment at issue here was the product of malice or ill-will or that any of plaintiff's alleged comparators were contextually similarly situated for purposes of application and enforcement of the law under the Equal Protection Clause.

### *Qualified Immunity*

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 351 (2014). The Supreme Court has recently explained that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the

defendant's shoes would have understood that he was violating it." *Plumhoff v. Richard*, 134 S.Ct. 2012, 2023 (2014) (citation omitted).

Each of the individual defendants are entitled to qualified immunity from this lawsuit. In light of the analysis set forth above with respect to the substance of plaintiffs' equal protection claim, it is clear that none of the named individuals should have known that they were violating the Constitution. No objectively reasonable official would believe that it would be unconstitutional to let plaintiffs comply with Easton's zoning law as they willingly did, unless the officials also chased down all other non-conforming equestrian enterprises elsewhere in Easton.

## CONCLUSION

So far as I can tell, plaintiffs are deeply devoted to their horse riding and boarding activities. And very much to their credit they decided to do all they could to abide in good faith with Easton's zoning law. It is no understatement to acknowledge that society counts on those like plaintiffs who internalize and voluntarily comply with the law because they believe it is the right thing do, rather than those who evade their obligations and comply—if at all—only when subject to penalty or other enforcement action. *See generally* Tom R. Tyler, WHY PEOPLE OBEY THE LAW (Yale Univ. Press 1990). Indeed, as one famed legal theorist has observed, "[a]t any given moment the life of any society which lives by rules, legal or not, is likely to consist in tension between those who, on the one hand, accept and voluntarily co-operate in maintaining the rules … and those who, on the other hand, reject the rule and attend to them only from the external point of view as a sign of possible punishment." H.LA. Hart, THE CONCEPT OF LAW 88 (Oxford Univ. Press. 1961).

It is understandable for plaintiffs to be frustrated that other horse businesses in Easton may be shirking their obligations and that town officials may be lax in requiring compliance. But these facts of themselves—as troubling as they may be—do not establish a federal claim for relief under the Equal Protection Clause. They neither establish that defendants lacked a rational basis for their action (or inaction), nor that defendants singled out plaintiffs for reasons of ill-will or malice.

Defendants' motion for summary judgment (Doc. #84) is GRANTED for lack of any genuine issue of fact that plaintiffs were subject to a violation of the Equal Protection Clause. In addition, each of the individual defendants is entitled to qualified immunity for lack of any triable fact to suggest that any reasonable official would have understood that it violated plaintiffs' constitutional rights to allow them to comply with Easton's zoning laws.

The Clerk is directed to close this case.

**SO ORDERED** this 20th day of July 2015, at New Haven, Connecticut.

> */s/ Jeffrey Alker Meyer*
> Jeffrey Alker Meyer
> United States District Judge